No. 14-1025 (L)

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

BEAZER HOMES CORPORATION; CROSSMANN COMMUNITIES OF
NORTH CAROLINA, INCORPORATED; CROSSMANN COMMUNITIES,
INCORPORATED; BEAZER HOMES INVESTMENT CORPORATION,

*Defendants and Third-Party Plaintiffs – Appellants*,

v.

HARLEYSVILLE MUTUAL INSURANCE COMPANY,

*Third-Party Defendant – Appellee*,

and

TRUE BLUE GOLF & RACQUET RESORT HOMEOWNERS' ASSOCIATION,

*Defendant*,

and

CINCINNATI INSURANCE COMPANY,

*Plaintiff*.
_____

Appeal from the United States District Court
for the District of South Carolina (Florence Division)
Civil Action No. 4:09-cv-01379-RBH
_____

## APPELLANTS' OPENING BRIEF
_____

Martin M. McNerney
Taylor T. Lankford
KING & SPALDING LLP
1700 Pennsylvania Ave., NW, Ste. 200
Washington, DC 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
*Attorneys for Appellants*

May 1, 2014

No. 14-1109

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT
_____

HARLEYSVILLE MUTUAL INSURANCE COMPANY,

*Third-Party Defendant – Appellant*,

v.

BEAZER HOMES CORPORATION; CROSSMANN COMMUNITIES OF
NORTH CAROLINA, INCORPORATED; CROSSMANN COMMUNITIES,
INCORPORATED; BEAZER HOMES INVESTMENT CORPORATION,

*Defendants and Third-Party Plaintiffs– Appellees*,

ILLINOIS UNION INSURANCE COMPANY; INDIANA INSURANCE
COMPANY; LIBERTY MUTUAL INSURANCE COMPANY;
MASSACHUSETTS BAY INSURANCE COMPANY; REGENT INSURANCE
COMPANY; ZURICH AMERICAN INSURANCE COMPANY,

*Fourth-Party Defendants– Appellees*,

and

CINCINNATI INSURANCE COMPANY,

*Plaintiff*,

and

TRUE BLUE GOLF & RACQUET RESORT HOMEOWNERS' ASSOCIATION,

*Defendant.*
_____

Appeal from the United States District Court
for the District of South Carolina (Florence Division)
Civil Action No. 4:09-cv-01379-RBH
_____

## CORPORATE DISCLOSURE STATEMENT

Pursuant to FRAP 26.1 and Local Rule 26.1, Beazer Homes Corporation; Crossmann Communities of North Carolina, Incorporated; Crossmann Communities, Incorporated; and Beazer Homes Investment Corporation, Appellants in the above captioned case, make the following disclosure:

1.      Is party/amicus a publicly held corporation or other publicly held entity? No.

2.      Does party/amicus have any parent corporations?  Yes.

Crossmann Communities of North Carolina, Incorporated and Crossmann Communities, Incorporated are wholly-owned subsidiaries of Beazer Homes Investments, LLC.  Beazer Homes Investments, LLC is a wholly-owned subsidiary of Beazer Homes Corporation, which is a wholly-owned subsidiary of Beazer Homes Holding Corporation, which is a wholly-owned subsidiary of Beazer Homes USA, Incorporated, a publically traded company.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? Yes.

Beazer Homes USA, Incorporated owns more than ten (10) percent of Beazer Homes Corporation; Beazer Homes Investments, LLC; Crossmann Communities of North Carolina, Incorporated; and Crossmann Communities, Incorporated.  Beazer Homes USA, Incorporated, is a publically traded company, which is traded on the New York Stock Exchange under the symbol "BZH."

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?  No.

5.      Is party a trade association? (amici curiae do not complete this question) If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member: No.

6.      Does this case arise out of a bankruptcy proceeding?  No.


 */s/ Martin M. McNerney*     
Martin M. McNerney

*Attorney for Appellants*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF AUTHORITIES ...................................................v

STATEMENT OF SUBJECT MATTER
     AND APPELLATE JURISDICTION ....................................1

STATEMENT OF THE ISSUES...............................................2

STATEMENT OF THE CASE ...............................................3

STATEMENT OF FACTS ...................................................15

     A.    The Beazer Entities ........................................15

     B.    The Nature Of The *True Blue Lawsuit* ...............16

     C.    The Harleysville Policy ....................................18

     D.    Beazer And Harleysville's Dealings Related To The Defense
And Settlement Of The *True Blue Lawsuit* ........................20

     E.    Beazer's Defense Costs For The *True Blue Lawsuit* .........24

     F.    Beazer's Costs To Settle The *True Blue Lawsuit* ............28

     G.    Beazer's Settlements With Insurers Other Than Harleysville ...........31

SUMMARY OF ARGUMENT ............................................32

ARGUMENT ..............................................................36

I.    Standard Of Review.................................................36

II.    The South Carolina Collateral Source Rule Applies To Breach Of
Contract Claims, Including Claims For Breach Of Insurance Contracts ......37

     A.    Application Of The Collateral Source Rule Is Consistent With
South Carolina Law Prohibiting Insurers From Seeking
Contribution For Breach Of The Duty To Defend.............................44

B.    The District Court's Grant Of Set-Off Relief To Harleysville Frustrates South Carolina Public Policies Regarding Insurance Coverage ........................................................................... 47

C.    Considerations Of Equity Preclude Harleysville From Reducing Its Liability by Set-Off ............................................................... 48

III.   Under South Carolina Law, When Calculating Harleysville's Time-On-Risk *Pro Rata* Share Of Progressive Damage In The *True Blue Lawsuit*, The District Court Erred In Selecting The Date Beazer Mailed Settlement Checks To Resolve The *True Blue Lawsuit* As The Ending Date Of The Progressive Damage .................................................... 50

CONCLUSION ............................................................................................. 55

REQUEST FOR ORAL ARGUMENT ....................................................... 56

CERTIFICATE OF COMPLIANCE ........................................................... 1

CERTIFICATE OF SERVICE .................................................................... 2

ADDENDUM

iv

# TABLE OF AUTHORITIES

## Cases

*Assurance Co. of Am. v. Penn-Am. Ins. Co.*,
  No. 4:11-cv-03425-RBH, 2013 WL 1282141
  (D.S.C. Mar. 27, 2013) ........................................................................ 34, 45, 46

*Atkinson v. Orkin Exterminating Co.*,
  361 S.C. 156 (2004) ............................................................................. 33, 38, 39

*Berenyi, Inc. v. Landmark Am. Ins. Co.*,
  No. 2:09-cv-01556, 2010 WL 233861 (D.S.C. Jan. 14, 2010) ........................47

*Brunswick Corp. v. St. Paul Fire & Marine Ins. Co.*,
  509 F. Supp. 75 (E.D. Pa. 1981) ....................................................................16

*Bryte ex rel. Bryte v. Am. Household, Inc.*,
  429 F.3d 469 (4th Cir. 2005) ..........................................................................36

*Crossmann Communities of N.C., Inc. v. Harleysville Mut. Ins. Co.*,
  395 S.C. 40 (2011) ................................................................................. *passim*

*F.T.C. v. Ross*,
  743 F.3d 886 (4th Cir. Feb. 25, 2014) ...........................................................37

*Helton v. AT&T, Inc.*,
  709 F.3d 343 (4th Cir. 2013) ..........................................................................37

*Isle of Palms Pest Control*,
  319, S.C. 12 (Ct. App. 1994) ..........................................................................47

*James v. Circuit City Stores, Inc.*,
  370 F.3d 417 (4th Cir. 2004) ..........................................................................36

*Liberty Mut. Fire Ins. Co. v. J.T. Walker Indus.*,
  No. 2:08-2043-MBS, 2012 WL 3292973 (D.S.C. Aug. 10, 2012),
  *rev'd in part on other grounds*,
  --- F. A'ppx ---, 2014 WL 504086 (4th Cir. Feb. 10, 2014) .......... 34, 43, 46, 47

*Otis Elevator, Inc. v. Hardin Constr. Co.*,
  316 S.C. 292 (1994) ...................................................................................... 42, 43

*Ross Dev. Corp. v. Fireman's Fund Ins. Co.*,
  809 F. Supp. 2d 449 (D.S.C. 2011) ............................................................ 43, 47

*Schrock v. Lancer Ins. Co.*,
  466 F. A'ppx 169 (4th Cir. 2012) (per curiam) ...............................................37

*Sloan Constr. Co. v. Cent. Nat'l Ins. Co.*,
    269 S.C. 183 (1977) ................................................................................ *passim*

*Stonehenge Eng'g Corp. v. Emp'rs Ins. of Wausau*,
    201 F.3d 296 (4th Cir. 2000)...................................................................53

*Town of Duncan v. State Budget & Control Board*,
    326 S.C. 6 (1997) ....................................................................................23

*Transcontinental Ins. Co. v. MAJ Enters., Inc.*,
    No. 2:05-cv-02594, 2005 WL 3465573 (D.S.C. Dec. 19, 2005).............. 34, 46

*True Blue Golf & Racquet Resort Homeowners' Association, Inc. &*
    *True Blue Golf & Racquet Resort Horizontal Property*
    *Regime v. Beazer Homes Corp. Inc. & Structure Home Builders, LLC*,
    No. 2009-CP-22-0912 (S.C. Ct. Com. Pl. June 17, 2009) ...................................4

*Welch v. Epstein*,
    342 S.C. 279 (2000) ...............................................................................48

*Wilkinson v. Palmetto State Transp. Co.*,
    371 S.C. 365 (2006),
    *rev'd on other grounds* 382 S.C. 295 (2009) ....................................... 33, 40, 41

**Statutes**

8 Del. Code § 259 ............................................................................................16
28 U.S.C. § 1332................................................................................................1

**Rules**

Fed. R. Civ. P. 52 ...........................................................................................37

**Other Authorities**

3-16 Appleman on Insurance §16.05 (2014) ...........................................................16

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

Subject matter jurisdiction in the District Court was proper under 28 U.S.C. § 1332(a) and (c) because this is a civil action between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Beazer[1] timely appealed from certain final rulings by the District Court. Therefore, this Court has appellate jurisdiction under 28 U.S.C. § 1291. On September 27, 2013, the District Court issued its (a) Findings of Fact, Conclusions of Law, and Order ("**Findings**") [JA7536]; and (b) Judgment [JA7590]. On October 25, 2013, Beazer filed a Notice of Appeal, appealing certain portions of the District Court's Findings and Judgment. [JA7592.] Later that same day, Harleysville Mutual Insurance Company ("**Harleysville**") filed Motions for Judgment Notwithstanding the Verdict, to Alter/Amend Judgment, to Amend/Make Additional Findings, and for New Trial. [JA7594.] By Order dated January 8, 2014, the District Court granted in part and denied in part Harleysville's motions [JA7640], and on January 9, 2014, the District Court modified the judgment to conform with the rulings in the January 8, 2014 Order. [JA7657.] Because the District Court's January 8, 2014 Order and revised Judgment

---

[1] As used herein, "**Beazer**" refers, collectively, to the following entities that were Plaintiffs in the District Court: Beazer Homes Corporation; Crossmann Communities of North Carolina, Incorporated; Crossmann Communities, Incorporated; and Beazer Homes Investment Corporation.

1

addressed one of the issues from the September 27, 2013 Findings and Judgment that was the subject of Beazer's Notice of Appeal, Beazer filed an Amended Notice of Appeal on February 7, 2014.

Harleysville filed a separate Notice of Appeal on February 3, 2014, appealing a much broader set of issues than Beazer. [JA7659.] In addition to appealing the September 2013 Findings and Judgment and January 2014 Order and revised Judgment by the District Court, Harleysville also appealed two February 2013 Orders by the District Court regarding the scope of Harleysville's duty to defend Beazer. [*Id.*] The two appeals were consolidated by Order of this Court on February 6, 2014. [Doc. No. 18.]

## STATEMENT OF THE ISSUES

Beazer's appeal addresses only two issues:

(1) Is Harleysville entitled to a reduction of the breach of contract damages owed to Beazer because Beazer received payments from insurers other than Harleysville, when South Carolina law clearly provides that (a) the collateral source rule is "liberally applied" to preclude set-offs for non-settling defendants, and (b) an insurer's duty to defend its policyholder is several and indivisible, and an insurer has no right to contribution with respect to payments by other insurers that may also have a duty to defend the policyholder?

(2) Whether, under South Carolina law, when calculating an insurance company's duty to indemnify its policyholder under a *pro rata* time-on-risk allocation methodology in a construction-defect lawsuit, the District Court improperly calculated the end of the time-on-risk period in a fashion that rewards insurers for wrongfully denying their coverage obligations to the policyholder?

## STATEMENT OF THE CASE

This insurance coverage action was filed in May 2009 by Cincinnati Insurance Company ("**Cincinnati**") against Crossmann Communities of North Carolina, Inc. ("**CCNC**"), Crossmann Communities, Inc. ("**CCI**"), and Beazer Homes Investment Corp. ("**BHIC**").[2]    [JA2300.][3]   Cincinnati sold "umbrella" insurance policies to CCI as the first named insured.   The Cincinnati umbrella policies were triggered upon exhaustion of the limits of underlying primary insurance and were in effect from July 1, 1998 until July 1, 2002.   [JA2356; JA2388.]  Cincinnati's complaint sought a declaration that, among other things, it owed no coverage obligations to Beazer under its insurance policies for losses

---

[2]   On September 20, 2012, the District Court granted Beazer's unopposed motion to join Beazer Homes Corp. as a party to the action.  [JA26.]

[3]   Cincinnati also named as a defendant in its original complaint the True Blue Golf & Racquet Resort Homeowners' Association (the "**True Blue HOA**"). Beazer stipulated to the dismissal of the True Blue HOA from this action, with prejudice, on July 10, 2013, after Beazer and Cincinnati reached an agreement in principle to settle their coverage disputes.   The Court dismissed the True Blue HOA as a party on July 10, 2013.  [JA7537 n.2.]

arising from construction-related property damage claims asserted against Beazer by homeowners at the "**True Blue Project**," a large residential complex located in Georgetown County, South Carolina, that includes eighty-four (84) condominium buildings, villas, and garden homes. Seventy-seven (77) of those structures were at issue in the underlying construction-defect lawsuit filed against Beazer by the True Blue HOA. [JA7541.][4]

On July 16, 2009, Beazer filed an Answer and Counterclaim in which Beazer sought, among other things, a declaration that Cincinnati had duties to defend and indemnify Beazer for the claims asserted and damages sought in the *True Blue Lawsuit*. Beazer also asserted a claim against Cincinnati for breach of its insurance contracts. [JA4304.]

After responding to Cincinnati's Complaint, on October 22, 2009, Beazer filed a Third-Party Complaint against Harleysville, an insurance company that sold primary insurance coverage to Pinehurst Builders Inc. ("**Pinehurst**") and CCNC as named insureds through August 29, 1998, when the **Harleysville Policy**[5] was

---

[4]  The True Blue HOA's complaint was captioned as follows: *True Blue Golf & Racquet Resort Homeowners' Association, Inc. and True Blue Golf & Racquet Resort Horizontal Property Regime v. Beazer Homes Corp. Inc. and Structure Home Builders, LLC*, No. 2009-CP-22-0912 (S.C. Ct. Com. Pl. June 17, 2009) (the "***True Blue Lawsuit***"). [JA2427.]

[5]  As used herein, "Harleysville Policy" refers to the Contractors' Business Owners insurance policy, with a policy period from 1993 through August 29, 1998. [JA39; JA262.]

cancelled.  [JA4909].  In its Third-Party Complaint, Beazer sought a declaratory judgment holding that Harleysville had breached its duties to defend and indemnify Beazer for the *True Blue Lawsuit*.  Specifically, Beazer sought a declaration that Harleysville had a duty to indemnify it for certain construction-related damage at the True Blue Project, because that damage was "property damage" caused by an "occurrence" (as those terms are defined in the Harleysville Policy), and that by denying coverage, Harleysville had breached its duty to indemnify.  Beazer also sought a declaration that the allegations in the *True Blue Lawsuit* triggered the Harleysville Policy's duty to defend Beazer, and that by refusing to defend Beazer against all claims in the *True Blue Lawsuit*, Harleysville had breached its duty to defend.  Beazer also sought an award of compensatory damages to make Beazer whole from Harleysville's breach of contract, including Beazer's attorneys' fees and related costs incurred in the insurance coverage action below to enforce Harleysville's duty to defend.  [JA4922-24.]

After being joined as a Third-Party Defendant, Harleysville filed a Fourth-Party Complaint against other insurance companies that also provided insurance coverage to Beazer, several of which had previously honored their duties to Beazer and paid Beazer for its losses incurred in prior construction defect litigation in

South Carolina state court. [JA-1176; JA1450; JA1819; JA5443.][6] Regent, Indiana Insurance, and Illinois Union, along with Harleysville, were at various times defendants in *Crossmann Communities of North Carolina, Inc. v. Harleysville Mutual Insurance Co.*, 395 S.C. 40 (2011) ("**Crossmann II**"), an insurance coverage action in South Carolina state court that involved, in part, some of the same insurance coverage issues in this case. Harleysville also joined several other insurance companies as Fourth-Party Defendants below and contended that these insurers also owed a duty to defend Beazer in the *True Blue Lawsuit* under their policies.[7]

In January 2012, the Fourth Party Defendants and Harleysville filed motions for summary judgment on Harleysville's fourth-party claims. [JA5110; JA5147; JA5193; JA5394; JA5435; JA5487.]

---

[6] In the *Crossmann II* litigation, Harleysville did not object to the dismissal, with prejudice, of these other insurance companies pursuant to the settlements reached with Beazer, nor did Harleysville otherwise object to any of these settlements. [JA5649.]

[7] Harleysville moved to join in the District Court as Fourth-Party Defendants Indiana Insurance Company, Massachusetts Bay Insurance Company, Regent Insurance Company, Illinois Union Insurance Company, Liberty Mutual Insurance Company, and Zurich Insurance Company. [JA4994.] Harleysville's Fourth-Party Complaint refers to Steadfast Insurance Company and American Guaranty and Liability Company as "Zurich American Insurance Company." Regent apparently was never served with Harleysville's summons and Fourth-Party Complaint, and therefore was not a party in the District Court.

6

On June 8, 2012, Beazer filed a motion for partial summary judgment seeking, among other things, a declaration that Harleysville was liable to Beazer for compensatory damages because Harleysville had an immediate duty to defend Beazer in the *True Blue Lawsuit* and that Harleysville had breached that duty. [JA5845.]

Harleysville subsequently filed a motion for summary judgment against Beazer seeking judgment in its favor on all claims in Beazer's Third-Party Complaint. [JA5852.] In its summary judgment motion, Harleysville argued that it owed no coverage to Beazer on three primary grounds: (1) the Harleysville Policy listed Pinehurst Builders and CCNC as the "Named Insured," and the plaintiffs in the *True Blue Lawsuit* named "Beazer Homes Corp. Inc." as defendant, and that Beazer Homes Corp. was not entitled to any insurance coverage under the Harleysville Policy; (2) the "impaired property" exclusion in the Harleysville Policy barred coverage; and (3) there was no "property damage" caused by an "occurrence" as required by the Harleysville Policy to trigger coverage.

By order entered on March 27, 2013, the Court denied Harleysville's Motion for Summary Judgment on its Fourth-Party Claims, declaring that under South Carolina law an insurer (such as Harleysville) whose duty to defend the policyholder is triggered by an underlying lawsuit had no right of contribution

7

against other insurers for the defense costs owed to its policyholder. The District Court therefore dismissed, with prejudice, all of the Fourth-Party Defendants. [JA6263.]

Also on March 27, 2013, the District Court granted in part and denied in part Beazer's Motion For Partial Summary Judgment On "Duty To Defend" Claims Against Harleysville, and denied Harleysville's Motion for Summary Judgment filed against Beazer. [JA6240.] The Court rejected Harleysville's main defense that Beazer Homes Corp. — the defendant in the *True Blue Lawsuit* — was not an insured under the Harleysville Policy on the grounds that Beazer Homes Corp. was the successor-by-merger to Pinehurst and CCI, both of which were named insureds under the Harleysville Policy, and therefore all rights to coverage of Pinehurst and CCI flowed to Beazer as a matter of law. The Court also entered partial summary judgment in favor of Beazer and against Harleysville declaring that Harleysville (a) "has an immediate duty to defend Beazer against all claims in the *True Blue Lawsuit*," (b) had breached that duty to defend Beazer, and (c) must reimburse Beazer for reasonable defense costs incurred in the *True Blue Lawsuit*. [JA6262.]

Shortly before trial, Cincinnati and Beazer settled their coverage disputes, and Cincinnati was subsequently dismissed, with prejudice, from the action. [JA34 no. 339.] The District Court also *sua sponte* re-aligned the parties for trial, with Beazer as Plaintiff and Harleysville as Defendant. [JA32, no. 315.]

8

After a two day bench trial on August 12-13, 2013, the District Court issued its Findings [JA7536] and a Judgment [JA7590] on September 27, 2013.  With respect to Harleysville's duty to defend Beazer, the Court reiterated the rulings in its March 27, 2013 Orders [JA6240; JA6263] — that Harleysville's duty to defend had been triggered, that Harleysville was jointly and severally liable to pay all of Beazer's defense costs for the *True Blue Lawsuit*, that Harleysville had breached that duty to defend by offering to defend Beazer against only a portion of the *True Blue Lawsuit*, and that Harleysville had no right of contribution against any other insurer that may also have a duty to defend Beazer.  [JA7571.]  Further, the District Court made the following findings:

- The total cost for Beazer to defend the *True Blue Lawsuit* was $2,572,522.05.  [JA7578 n.9.]

- $129,753 should be deducted from Beazer's total unreimbursed defense costs because part of that amount was paid by Harleysville for court reporters and similar litigation costs, and part of that amount was related to work performed by attorneys retained by Beazer that was duplicative of work performed by Stephen L. Brown, an attorney Harleysville retained to represent Beazer against a few of the claims — but not all claims — in the *True Blue Lawsuit*.  [JA7578-79; JA7585-86.]

9

- $79,390.51 should be deducted from the defense cost component of Beazer's breach of contract damages (for which Harleysville was liable to account) for specifically-designated defense costs paid by another insurer. [JA7556 n.5; JA7558; JA7578 n.9]

Given these findings, the reasonable and necessary defense costs incurred by Beazer to defend the *True Blue Lawsuit* that were a portion of Beazer's compensatory damages claim against Harleysville totaled $2,363,378.54. [JA7578-79; JA7585-86; JA7556-57.]

With respect to Harleysville's indemnity obligation to Beazer for property damage at the True Blue Project, the District Court found that:

- "No exclusion in the Harleysville Policy bars coverage, and Harleysville must indemnify Beazer in accordance with the *pro rata* time-on-risk method outlined in [*Crossmann II*]." [JA7566.]

- "[T]welve [out of seventy-seven (77)] buildings constructed at the True Blue [Project] triggered coverage under the Harleysville Policies." [JA7570.]

- The cost to repair covered damage at the twelve buildings at the True Blue Project that triggered coverage under the Harleysville Policies was $40,407 per building. *Id.*

10

- Under *Crossmann II*, the covered damage at the True Blue Project "occurred approximately thirty (30) days after the date on which the certificates of occupancy were issued for each building." [JA7568.]

- "[T]he damage [at the twelve buildings] progressed []from thirty days after the certificate of occupancy [for each of the twelve buildings] was issued until the date on which Beazer Homes paid [to settle the *True Blue Lawsuit*]. . ." [JA7570.]

- Harleysville's *pro-rata* time-on-risk indemnity obligation to Beazer was $16,473. [JA7571.]

Based on these findings, the District Court entered judgment in favor of Beazer on Harleysville's breach of its duty to indemnify in the amount of $16,473.34. [JA7571; JA7590.]

The District Court also found that Beazer was entitled, under well-settled South Carolina law, to recover its reasonable attorneys' fees and costs incurred in the coverage action to enforce Harleysville's duties to Beazer.[8] [JA7588.]

---

[8] The Court's September 27, 2013 Findings and Judgment dealing with the attorneys' fees and costs incurred by Beazer in this action to enforce Harleysville's duty to defend directed the parties to attempt to agree on the amount of attorneys' fees and costs to which Beazer was entitled and, if the parties could not agree, Beazer was to file a Rule 54 Motion for Attorneys' Fees. After an unsuccessful attempt to agree with Harleysville on the amount of attorneys' fees and costs to be awarded, Beazer filed a timely Rule 54 motion addressing the amount of fees and costs that should be awarded to Beazer.

11

Another issue addressed by the District Court was Harleysville's request that the judgment against it be reduced by amounts Beazer received in settlement from insurers unrelated to Harleysville. Beazer argued that South Carolina's liberally-applied collateral source required that Harleysville's liability to Beazer for breach of its duty to defend should not be reduced because of settlements reached between Beazer and other insurers under unrelated insurance contracts. Among other things, Beazer demonstrated that it still had substantial uninsured losses from the *True Blue Lawsuit* even if all the insurer settlements, and the full amount of damages sought from Harleysville were netted against the full amount of Beazer's *True Blue Lawsuit* defense costs and the settlement payment to the True Blue HOA. The District Court found that "[t]he collateral source rule only applies to tort claims," and that "[i]t has no bearing on the breach of contract claims." [JA7584.] The District Court then deducted $1,275,380 (a portion of the settlement proceeds Beazer recovered from other insurers) from the judgment against Harleysville and ordered Harleysville to pay $1,087,998 to Beazer, plus

---

[JA7640.] In that motion, Beazer asked for an award of all attorneys' fees and costs, including any fees and costs incurred in any appeal, to enforce Harleysville's duty to defend. The District Court has not ruled on Beazer's Rule 54 motion for attorneys' fees. Accordingly, if this Court affirms the District Court's award of attorneys' fees and costs to Beazer, Beazer respectfully requests that the Court issue a remand order directing the District Court to determine the appropriate amount of attorneys' fees and costs to award to Beazer, including attorneys' fees and costs incurred in this appeal.

Beazer's attorneys' fees and costs incurred in the coverage action to enforce Harleysville's duty to defend.  [JA7590.][9]

On October 25, 2013 Beazer filed a Notice of Appeal [JA7592] from the District Court's (a) September 27, 2013 Findings [JA7536]; and (b) September 27, 2013 Judgment [JA7590].  On the same day that Beazer filed its Notice of Appeal, Harleysville filed Motions for Judgment Notwithstanding the Verdict, to Alter/Amend Judgment, to Amend/Make Additional Findings, and for New Trial. [JA7594], alleging a variety errors in the District Court's Findings [JA7536] and Judgment [JA7590].

During trial, the parties' respective construction cost expert witnesses offered testimony on the cost to repair various aspects of the property damage at the True Blue Project.  In its post-judgment motions, Harleysville argued that the cost of repair calculations by the parties' experts were based on the total damages at the twelve buildings in the True Blue Project covered by the Harleysville Policy, and did not reflect that proportion of the amount actually paid by Beazer in

---

[9]   The District Court allocated 43 percent of the settlement amounts recovered by Beazer from other insurers to defense costs because the amount of Beazer's unreimbursed attorneys' fees represented 43 percent of Beazer's costs to defend and settle the *True Blue Lawsuit*.  [JA7558.]  Accordingly, the District Court calculated that $1,275,380 from the settlement payment received from insurance carriers other than Harleysville should be deducted as a set-off from the amount of the judgment against Harleysville.  [JA7558-59.]

settlement with the HOA that was related to the repair of the twelve buildings. [JA7596.]

By Order dated January 8, 2014, the District Court denied the motions by Harleysville for Judgment NOV and for New Trial, but made additional findings and amended the September 27, 2013 judgment as to Harleysville's time-on-risk indemnity obligation to Beazer. [JA7655] The District Court accepted Harleysville's arguments on this narrow point addressed in the paragraph above and recalculated Harleysville's indemnity obligation to Beazer to be $3,565.00. [JA7646-48.] The District Court made no post-judgment revisions to its Findings and Judgment addressing the measure of damages for Harleysville's breach of its duty to defend or Beazer's right to recover attorneys' fees and costs in the coverage litigation to enforce Harleysville's duty to defend. On January 9, 2014, the District Court also modified its September 27, 2013 judgment to conform with the rulings in the January 8 Order. [JA7657.]

On February 2, 2014 Harleysville filed its appeal to the Fourth Circuit [JA7659], and on February 7, 2014, Beazer filed an Amended Notice of Appeal to include the District Court's January 8, 2014 Order and January 9, 2014 Amended Judgment [JA7662].

## STATEMENT OF FACTS

### A.    The Beazer Entities

As noted in the Amended Complaint filed in the *True Blue Lawsuit* [JA2451], Beazer is the successor-in-interest by merger to Pinehurst and CCNC. Pinehurst was a company engaged in the business of real estate development and construction.  In May 1998, Pinehurst was merged into CCNC, which was at the time a subsidiary of its parent company, CCI [CCI, 10-Q, Aug. 14, 1998, available at   https://www.sec.gov/Archives/edgar/data/911644/0000911644-98-000008.txt]. By Agreement and Plan of Merger dated January 29, 2002, parent company CCI and its wholly-owned subsidiaries, including CCNC, merged with Beazer Homes Investment Corp.  [JA728-29; *see also* JA874 (noting that CCNC was a subsidiary of CCI in 2001).]  In addition to this merger at the parent company level, on January 1, 2005, CCNC merged into Beazer Homes Corp. ("BHC").  [JA1171.][10] As a result of these transactions, Beazer Homes Corp. became the successor by

---

[10]    Harleysville acknowledged the same facts in its pleadings in the District Court, stating that "on or about May 29, 1998, Pinehurst Builders, Inc. ("Pinehurst") merged into Crossmann Communities of North Carolina, Inc. ("CCNC"), a wholly owned subsidiary of Crossmann Communities, Inc.," and that "[t]hereafter, on or about January 20, 2002, Crossmann Communities, Inc. merged with Beazer Homes Investment Corp.," which was the wholly-owned subsidiary of Beazer Homes Corp.  [JA5862.]

merger to Pinehurst and CCNC.[11]

## B.    The Nature Of The *True Blue Lawsuit*

On June 17, 2009, the True Blue homeowner's association filed the *True Blue Lawsuit* against Beazer Homes Corp. and Structure Home Builders in South Carolina state court seeking to recover damages arising from the defective construction of the True Blue Project.  Beazer Homes Corp. was named as a defendant in the *True Blue Lawsuit* in its capacity as "Surviving Corporation and Successor in Interest to [CCNC], which merged with [Pinehurst], [and] was and is also the General Contractor for all aspects of the original building and construction of the True Blue Project."  [JA2431; JA2449.]  The official Building Permits

---

[11] The undisputed fact that Beazer is the successor by statutory merger to Pinehurst and Crossmann, and that the relevant corporate transactions were mergers and not asset sales, is significant.  The primary basis upon which Harleysville denied coverage to Beazer is Harleysville's assertion that Beazer Homes Corp. did not succeed to Pinehurst's and CCNC's rights under the Harleysville Policy because Beazer Homes Corp. is not a "named insured" under the Harleysville Policy.  As found by the District Court, however, in a statutory merger, the rights under insurance policies transfer automatically to the surviving entity by operation of law.  *See, e.g.*, 8 Del. Code § 259 ("***all and singular, the rights, privileges***, powers and franchises of each of said corporations, . . . ***a[nd] all other things in action or belonging to each of such corporations shall be vested in the corporation surviving or resulting from such merger or consolidation***.") (emphasis added) (the 2002 Beazer-CCNC merger is governed by Delaware law); *Brunswick Corp. v. St. Paul Fire & Marine Ins. Co.*, 509 F. Supp. 750, 752-53 (E.D. Pa. 1981) (applying Delaware law) ("***Upon merger, the[] [merged company's rights under its insurance policies] automatically vested in the surviving corporation by operation of the merger statute***.") (emphasis added); *see also* 3-16 Appleman on Insurance §16.05 (2014).

16

issued by Horry County, South Carolina also identify Crossmann Communities or Pinehurst as the owner for each of the seventy-seven (77) buildings at issue in the *True Blue Lawsuit*.    [JA5988-6143.]    The Building Permits also identify Crossmann Communities, Pinehurst, or Mr. Jeffrey H. Skelley[12] as the contractor for sixty-one (61) of the seventy-seven (77) buildings at issue in the *True Blue Lawsuit*, and list Beazer Homes Corp. as the contractor for only sixteen (16) of the seventy-seven (77) buildings at issue in the *True Blue Lawsuit*.  [*Id*.][13]

In its June 18, 2009 Amended Complaint, the True Blue HOA alleged that as a result of the construction defects, ". . . substantial parts of the buildings have been and will be continuously and repeatedly exposed to leaks causing moisture infiltration resulting in mold, rot, deterioration and degradation of the buildings." [JA2454-55.]   In addition, the True Blue HOA alleged that "products either individually and/or aggregately defectively installed and/or defective at the time of installation have caused the buildings and various portions of the common elements to be continuously and repeatedly exposed to excessive moisture

---

[12]  Mr. Skelley was a principal in Pinehurst and held the general contractor's license for Pinehurst.  [JA7363, lines 12-15 ("Q.  Do you know who held the general contractor's license for the building. . . — for the construction of building[]s 1 through 13 of Pinehurst Builders?  A. If  I could look back, I think it was Mr. Skelley.").]

[13]  There is no dispute that Crossmann Communities is an insured under the Harleysville Policy.

resulting in mold, mildew, rot, rust and degradation of the various component parts of the common elements of the buildings and other common elements." [*Id*.]

The *True Blue Lawsuit* was a complex matter for Beazer to investigate and defend, and the financial exposure Beazer faced was large. The True Blue HOA alleged that the likely cost to repair the property damage caused by the defective construction at the True Blue Project was approximately $23.5 million, and that Beazer was liable for at least that amount. [JA5456 ($22,553,146.98); JA5484 ($948,384.72).] The *True Blue Lawsuit* involved nearly fifty parties and numerous expert witnesses. [JA6423, line 6.]

### C.    The Harleysville Policy

Harleysville's duties to defend and to indemnify Beazer are governed by the Harleysville Policy, which had a policy period extending to August 29, 1998. [JA343.] The Harleysville Policy has an "each occurrence" limit of $1 million per policy period, and a "general aggregate" limit of $2 million per policy period. Under the Policy, Harleysville must "pay those sums that [Beazer] becomes legally obligated to pay as damages because of. . . 'property damage'. . ." caused by an "occurrence" during the period the Harleysville Policy was in effect. [JA299.] The Harleysville Policy also provides that Harleysville has the "duty to defend any 'suit' seeking those damages." [*Id*.] Amounts paid by Harleysville as defense costs do not erode the available limits of coverage provided by the Policy.

18

"Property damage" is defined in the Harleysville Policy as "[p]hysical injury to tangible property, including all resulting loss of use of that property," and "loss of use of tangible property that is not physically injured." [JA310.] "Occurrence" is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." [*Id*.]

These and a number of other terms in the Harleysville Policy were the subject of earlier insurance coverage litigation between Beazer and Harleysville, arising from different construction defect lawsuits filed against Beazer by other homeowners' associations in South Carolina. *See Crossmann II*, 395 S.C. 40. In *Crossmann II*, the South Carolina Supreme Court affirmed the trial court's finding that certain water-related damage to buildings, for which Crossmann and Beazer acted as developer and general contractor, triggered coverage under the same Harleysville Policy at issue in this case because the water damage to otherwise non-defective parts of the buildings constituted "property damage" caused by an "occurrence," as those terms are defined in the Policy. *Id.* at 47. The Supreme Court also held that each insurer whose duty to indemnify was triggered by property damage caused by an occurrence was liable to pay Beazer for the cost to repair the damage that occurred during that insurer's policy periods. *Id*. at 63 ("[T]he proper method for allocating damages in a progressive property damage case is to assign each triggered insurer a pro rata portion of the loss based on that

insurer's time on the risk."). *Crossmann II* addressed only Harleysville's duty to indemnify its policyholder, and did not address the scope of a primary insurer's much broader duty to defend the policyholder.

### D. Beazer And Harleysville's Dealings Related To The Defense And Settlement Of The *True Blue Lawsuit*

After the True Blue HOA advised Beazer of construction-related problems at the True Blue Project, Beazer attempted to resolve issues amicably by undertaking certain repairs at the True Blue Project from 2007 through 2009. After the True Blue HOA asserted claims against Beazer, but before the *True Blue Lawsuit* was filed, Beazer notified Harleysville of the True Blue HOA homeowners' claims by letter dated December 16, 2008. [JA2286.] Harleysville initially denied coverage for the True Blue HOA's claims by letter dated June 10, 2009. [JA2424.]

The original Complaint in the *True Blue Lawsuit* was filed on June 17, 2009, and the Amended Complaint was filed the next day. [JA2427.] By letter dated June 26, 2009 [JA4209; JA4282], Beazer forwarded a copy of the Amended Complaint to Mr. Derrick Harris, a Construction Defect Litigation Specialist employed by Harleysville. In that letter, Beazer demanded that Harleysville defend Beazer against all the claims in the *True Blue Lawsuit* in accordance with the duty to defend provision in the Harleysville Policy. [JA4209.]

Harleysville did not respond to Beazer's June 26, 2009 letter in either June or in July. Beazer could not wait indefinitely to hear whether Harleysville would honor its duty to defend, so Beazer retained Mr. L. Franklin Elmore of the Elmore Goldsmith law firm as lead defense counsel, who filed an answer to the amended complaint on behalf of Beazer. [JA4370.]

Harleysville finally responded to Beazer by letter dated August 24, 2009. [JA4359.] In that letter, Harleysville advised Beazer that Harleysville would defend Beazer in the *True Blue Lawsuit*, but only with respect to those few claims relating solely to Buildings 1-13 at the True Blue Project, which were the buildings that were constructed and for which certificates of occupancy were issued before expiration of the last Harleysville policy period. Specifically, Harleysville advised Beazer that:

> **Harleysville specifically disclaims coverage for all damages arising from claims regarding construction defects of those buildings for which certificates of occupancy were issued after the Pinehurst Builders Policy was cancelled on August 29, 1998 and all claims regarding the remediation, repair and replacement of all 83 buildings. All coverage for the buildings whose certificates of occupancy were issued after August 29, 1998 and all coverage for all remediation, repair and replacement of all 83 buildings, including the duty to defend and to indemnify, are hereby disclaimed.**

[JA4367 (bold type in original).]

By letter dated September 23, 2009, Beazer advised Harleysville that it disagreed with Harleysville's disclaimer of its duty to defend all claims in the *True*

21

*Blue Lawsuit*. [JA4482.] Beazer's September 23, 2009 letter asked Harleysville to reimburse Beazer for all of its defense costs in the *True Blue Lawsuit* and attached a draft of the Third-Party Complaint that Beazer eventually filed against Harleysville in the District Court below. [JA4604.]

By letter dated September 25, 2009 [JA4659], Harleysville's counsel reiterated the position set forth in Harleysville's August 24, 2009 letter [JA4359] — that Harleysville would defend only those claims in the *True Blue Lawsuit* related to Buildings 1-13 of the True Blue Project, and that Beazer was on its own to defend all other claims in the *True Blue Lawsuit*. [JA4659.]

On September 24, 2009, Harleysville communicated with Charleston, South Carolina attorney Mr. Stephen Brown of Young Clement Rivers LLP ("**YCR**") about representing Beazer in the *True Blue Lawsuit* to defend against the few claims relating solely to Buildings 1-13. [JA4666.] On October 1, 2009, Harleysville sent Mr. Brown a retention letter for this engagement, even though Beazer had already retained Mr. Elmore as defense counsel and Mr. Elmore's firm had answered the Complaint. Harleysville's retention letter with Mr. Brown stated as follows:

Assignment Instructions:

1.) Upon receipt of the file, please review and file the appropriate answer to protect the interests of the named insured. Although the named insured is not specifically listed as a defendant in the complaint, the complaint alleges "Beazer Homes, as the

22

surviving Corporation and Successor in Interest to Crossman Communities of North Carolina, Inc., which merged with Pinehurst Builders Inc." Accordingly you are instructed to enter an appearance, answer and defend Beazer Homes as a successor in interest to the named insured.

2.) It is understood at this time the insured was the general contractor for a certain number of the total Buildings claimed involved in the complaint. At this time, it is believed that Buildings 1-13 were to have been constructed by the insured. *Therefore, your defense efforts should be concentrated to those specific buildings only*.

[JA4661 (emphasis added).]

By letter dated October 9, 2009 [JA4663], Beazer reiterated its disagreement with Harleysville on the scope of the duty to defend Beazer in the *True Blue Lawsuit*, and that "Beazer Homes believes that Harleysville must defend [Beazer against all claims in] the entire case," citing to the South Carolina Supreme Court's 1997 opinion in *Town of Duncan v. State Budget & Control Board*, 326 S.C. 6, 16 (1997) ("where a lawsuit contains several causes of action, some of which are covered under the policy and some of which are not, an insurer is not justified in refusing to defend the entire suit"), and the opinion in *Sloan Construction Co. v. Central National Insurance Co.*, 269 S.C. 183, 187 (1977). On November 10, 2009, six weeks after receiving the October 1, 2009 retention letter from Harleysville, Mr. Stephen Brown and YCR filed a Notice of Appearance of Additional Counsel in the *True Blue Lawsuit*. [JA4956.] That Notice stated that YCR "will hereby appear as additional counsel of record for Beazer Homes Corp.,

Inc. only in its capacity as Successor in interest to Crossman [sic] Communities of North Carolina, Inc. doing business as Pinehurst Builders and Pinehurst Builders, Inc." [*Id*.]

### E. Beazer's Defense Costs For The *True Blue Lawsuit*

A number of factors made the *True Blue Lawsuit* complicated from a defense perspective. The True Blue HOA sought compensatory damages against Beazer of approximately $23 million. [JA5456 ($22,553,146.98); JA5484 ($948,384.72).] Some of the other risks Beazer faced were summarized by counsel hired by Harleysville to address a portion of the *True Blue Lawsuit*, who advised Harleysville in a secret communication not shared with Beazer as follows:

- The True Blue HOA's counsel, Mr. Luther McCutcheon and Pat O'Day, "are very experienced in construction litigation, and are very competent trial lawyers." [JA5051.]

- "A jury will likely award 60 to 80 percent of the cost of remedial construction [, and] [p]unitive damages are a high probability if this matter is tried." [*Id*.]

- The True Blue HOA's primary damages expert witness, Mr. Derek Hodgin, was a very credible testifying expert. [JA5065.]

During the pendency of the *True Blue Lawsuit*, Harleysville's counsel, Mr. Stephen Brown, Beazer's counsel, Mr. Elmore, and the plaintiff HOA's counsel,

Mr. McCutchen, joined in a motion asking the trial court to designate the *True Blue Lawsuit* as a "Complex Case" under the South Carolina state court rules. [*See, e.g.*, JA4690, 6/18/2010 time entries.]  The court in the *True Blue Lawsuit* granted the parties' joint motion.

In addition, several witnesses testified at trial that discovery in the *True Blue Lawsuit* was complex.  For example, Beazer's documents relevant to the True Blue Project were located in a number of different locations and were not organized by project, which made collection and review of potentially relevant documents requested in discovery by the True Blue HOA more time consuming and expensive.  [*See*, JA7341, line 8 through JA7348, line 14.][14] Lead counsel for the True Blue HOA testified that in his more than 35 years in practice, the *True Blue Lawsuit* was the most complex case he had handled. [JA8304, lines 16-19 ("This particular project, as a single point project it was the largest and most complex project I've ever been involved with in my life."); JA8277, lines 2-3.]

---

[14] Beazer and its predecessors, Crossmann and Pinehurst, organized and maintained construction records by subcontractor or vendor, rather than by project, which complicated defense of the action.  For example, in order to identify the subcontractor that performed plumbing work at a particular building at the True Blue Project, it was necessary for Beazer to examine all the files for every plumber Crossmann and Pinehurst ever hired.  Further, the documents related to the True Blue Project were located in multiple locations and on multiple computer systems, which also complicated the investigation and defense of the case.  [See, JA7341 line 8 through JA7348, line 14.]

Beazer was cognizant of defending the *True Blue Lawsuit* in a cost-effective manner and, in that regard, undertook several defense tasks at its own expense for which it did not seek recovery from Harleysville.  Mr. William Fisher, who at all relevant times was Beazer's national claims manager [JA7512, line 23 through JA7513, line 3], testified that Beazer defended the *True Blue Lawsuit* as if it was an uninsured lawsuit, in large part because no insurer had at the time agreed to defend Beazer against all claims in the *True Blue Lawsuit*.  [JA7514 lines 4-16.] Mr. Fisher also testified that Beazer only billed one-third of the cost of the document review and coding project to the matter file for defense of the *True Blue Lawsuit*.  [JA7523, line 10 through JA7524, line 20.]  Beazer split the costs of the document collections, review, and coding among the matter files for True Blue (the underlying case that is the subject of this insurance coverage matter) as well as two other construction defect-related claims (for the Fairways and St. Andrews projects) arising from the Pinehurst and Crossmann operations that are not at issue in this action.  Beazer decided to split these substantial costs into three equal shares, even though the majority of the documents to be reviewed and coded dealt with the True Blue Project, which was a much larger project than either Fairways or St. Andrews.  [*Id*.]  Beazer also paid substantial sums to the Elmore Goldsmith firm and to Mr. Moore, Beazer's construction and cost of repair expert, for professional services rendered to investigate the claims of the True Blue HOA

before the *True Blue Lawsuit* was filed and for which reimbursement was not sought by Beazer from Harleysville. [JA7435, line 13 through JA7436, line 7; JA7338, line 12 through JA7339, line 5.] Those pre-lawsuit payments by Beazer helped the Elmore Goldsmith firm and Mr. Moore gain a foundation of knowledge about the True Blue Project. Finally, Beazer retained and paid for a contract attorney and a contract paralegal at its own expense to help collect and review documents related to the True Blue Project and the *True Blue Lawsuit*. [JA7525, line 19 through JA7526, line 24.] All of these actions by Beazer had the effect of reducing the defense costs Beazer sought from Harleysville.

The Elmore Goldsmith firm charged hourly rates to Beazer for the defense of the *True Blue Lawsuit* that were somewhat below that firm's standard hourly billing rates. [JA6310, line 20 through JA6313, line 13.] In that regard, Harleysville never communicated with either Beazer or Elmore Goldsmith to advise as to what hourly rates for defense counsel Harleysville considered reasonable for the *True Blue Lawsuit*. [JA7577; JA7520, lines 7-12 (noting that at no point in time did Harleysville send Beazer any document with procedures for outside counsel); JA7521, lines 7-13 (noting that Harleysville never provided any other guidance to Beazer as to how to defend the *True Blue Lawsuit*).] Harleysville also never notified Beazer or Elmore Goldsmith as to the specific defense-related tasks that Harleysville believed were reasonable and necessary and

those that Harleysville believed were either unreasonable or unnecessary. Harleysville knew in 2009 that Beazer was seeking an award of defense costs for the *True Blue Lawsuit* in this insurance coverage action, but chose not to provide any guidance on these topics to Beazer during the time the *True Blue Lawsuit* was pending. [JA4922-24.]

At trial, Beazer introduced into evidence copies of all the invoices it received from attorneys, court reporters, expert witnesses, and others showing the amounts billed to and paid by Beazer to defend the *True Blue Lawsuit*. [JA2466.] Beazer also presented evidence at trial about its third-party claims administrator, Helmsman Claims Management, employed by Beazer during the pendency of the *True Blue Lawsuit*. Mr. William Fisher, Beazer's National Claims Manager, testified that both he and Helmsman contemporaneously reviewed all of the defense cost invoices before they were approved for payment. [JA7514, line 17 through JA7518, line 15.] Beazer's total cost to defend the *True Blue Lawsuit* was $2,572,522.05. [JA7556 n.5.]

### F.    Beazer's Costs To Settle The *True Blue Lawsuit*

Beazer and the True Blue HOA finalized a settlement agreement in the *True Blue Lawsuit* in November 2012. [JA6187.] Pursuant to that agreement, Beazer paid the True Blue HOA a total of $3,336,800 to settle the *True Blue Lawsuit*, in

checks that were mailed on January 17, 2013 and May 10, 2013. [JA6195; JA6279.]

Beazer and Harleysville presented evidence at trial in the District Court below regarding the nature and causes of damage to the buildings at the True Blue Project. That evidence showed that defective construction of various components of the buildings allowed moisture to penetrate into the buildings, and this moisture resulted in damage to interior portions of the buildings that were previously undamaged. [*See, e.g.*, JA7439, line 17 through JA7441, line 25.] Beazer's expert, Mr. Moore, testified that damage began at the time of the first rain event and progressed continually from that point forward. [JA7467, lines 6-21; JA7474, line 23 though JA7475 line 7.] Harleysville's expert, Mr. Mathis, testified only as to when he thought repairs were necessary, not the time the water intrusion damage actually began. [JA8329, line 4 through JA8331 line 4.]

Mr. Moore, Beazer's expert, testified that the reasonable cost to repair the resulting property damage at Buildings 1-13 was no less than $660,000. [JA6658.] His analysis was based upon (1) several dozen site investigations, including site investigations of the repair work as it was being conducted at the True Blue Project to the buildings that triggered the Harleysville Policy [JA7433, line 12 through JA7434, line 4; *see also* JA7442, lines 7-8 ("We looked at, and I personally at some point in time over the period of the last five years looked at all 77

29

buildings.")]; (2) destructive testing [JA6652]; (3) a review of the True Blue HOA construction experts' field notes, reports, thousands of photographs produced in the *True Blue Lawsuit* [*Id*.]; and (4) the True Blue HOA experts' repair scope and costs of repair estimates for Buildings 1-13 produced in the *True Blue Lawsuit*. [*Id*.]

Harleysville's expert, Mr. Mathis, testified that the cost to repair the resulting damages for all seventy-seven (77) buildings at the True Blue Project was $390,588.38. [JA8327, lines 2-11.] His testimony was based upon his interpretation of a pre-litigation June 2008 report prepared by the HOA's expert in the *True Blue Lawsuit*. [JA8332, lines 2-15.] Mr. Mathis did not personally observe any of the repair work on Buildings 1-13. [JA8331, lines 12-16.] Mr. Mathis's analysis did not involve any destructive testing [JA8331, line 21 through JA8332, line 1], any review or analysis of the four subsequent reports by the HOA's expert issued after June 2008, any review or analysis of the HOA expert's field notes or photographs, any review or analysis of the scope of repair or cost estimates produced in the *True Blue Lawsuit*, or any review or analysis of photographs produced in the underlying case by the cost of repair contractor, Beazer's construction expert, or other experts. [JA8335, 17 through JA8338, line 20.]

### G.    Beazer's    Settlements    With    Insurers    Other    Than    Harleysville

From the date the *True Blue Lawsuit* was filed in June 2009, no insurer agreed to defend Beazer against all claims in the lawsuit or to indemnify Beazer for a settlement or judgment.  Beazer thus pressed its coverage claims against both Cincinnati and Harleysville, in this action, as well as against several other potentially responsible insurers starting in late 2012, as the *True Blue Lawsuit* was approaching mediation and trial, several insurers other than Harleysville agreed to settle with Beazer.  The amounts paid to Beazer by these other insurers are set forth in confidential settlement agreements that were filed in the District Court under seal and other documents, and total $3,045,390.51.  Of that total amount, only $79,390.51 was specifically identified as defense cost payments in the settlement agreements.

When all of Beazer's losses[15] and recoveries[16] in the *True Blue Lawsuit* are aggregated, Beazer had a net loss of $2,863,931.54 at the time of trial in the

---

[15]  Total defense cost payments: $2,572,522.05 [JA7556 n. 21];
Total settlement payments to True Blue HOA: $3,336,800 [JA6190; JA6196; JA6280]
***Total paid by Beazer in defense and settlement = $5,909,322.05***

The District Court calculated Beazer's total out-of-pocket cost for the *True Blue Lawsuit* to be $5,829,931 because Beazer was paid $79,390.51 by an insurer during the pendency of the *True Blue Lawsuit*.  [JA7558.]    Whether the $79,390.51 is subtracted directly from the total of Beazer's out-of-pocket costs,

District Court.  If the judgment entered by the District Court were to be paid by Harleysville, Beazer would still have unreimbursed out-of-pocket costs of $1,772,368.54[17] for the *True Blue Lawsuit*.  In addition, Beazer incurred over $100,000 in attorneys' fees pursuing settlements with insurers other than Harleysville.  [JA7529, line 18 through JA7531, line 15.]  Further, Beazer has incurred substantial attorneys' fees and costs to enforce Harleysville's duty to defend Beazer, as outlined in Beazer's Rule 54 Motion for Attorneys' Fees filed in the District Court.  [JA7640.]

## SUMMARY OF ARGUMENT

The collateral source rule provides that "a wrongdoer should not receive a windfall simply because the injured party received compensation from an independent source[,]" and it is liberally applied in South Carolina.  *Atkinson v.*

---

or is accounted for as a settlement recovery (see note 16 below), does not affect the total of Beazer's out-of-pocket costs.

[16] Confidential Settlement 1: $280,000 (this settlement agreement involved two separate insurance carriers and was treated by the District Court in its findings as two separate settlements) [JA7668];
Confidential Settlement 2: $460,000 [JA7676];
Confidential Settlement 3: $79,390.51 in defense and an additional $500,000 [JA7679-80]
Cincinnati Settlement: $626,000 [JA6713];
Certain London-Based Insurers Settlement: $1,100,000 [JA6144]
***Total settlement recoveries from insurers other than Harleysville = $3,045,391***.

[17] (Beazer's out-of-pocket loss of $2,863,931.54) – (final judgment of the District Court of $1,091,563 [JA7657]) = $1,772,368.54 Beazer's unreimbursed losses in the *True Blue Lawsuit* if the District Court's judgment is affirmed.

*Orkin Exterminating Co.*, 361 S.C. 156, 172 (2004). As applied by South Carolina courts, the collateral source rule precludes Harleysville from reducing its liability for breach of its joint, several, and indivisible duty to defend Beazer against all claims in the *True Blue Lawsuit* by crediting Harleysville with portions of the settlement payments Beazer recovered from other insurance companies. In its Findings [JA7536], January 8, 2014 Order [JA7644], and judgments [JA7590; JA7657], the District Court incorrectly held that the collateral source rule does not apply to breach of contract cases like this insurance coverage action.

The fact is that the South Carolina Supreme Court applied the collateral source rule to a breach of contract action in *Atkinson*, 361 S.C. 156, and the result in *Atkinson* — the non-settling defendant was denied any set-off for payments made to the plaintiff by the settling defendant — controls in this case. *Atkinson* makes clear that the collateral source rule applies in breach of contract claims, and the South Carolina Court of Appeals has applied the holding in *Atkinson* to enforce the collateral source rule in a breach of contract action involving two insurance policies in *Wilkinson v. Palmetto State Transportation Co.*, 371 S.C. 365 (2006), *rev'd on other grounds* 382 S.C. 295 (2009).

Applying the collateral source rule to prevent Harleysville from reducing its defense obligation to Beazer is not only required by *Atkinson* and *Wilkinson*, but it is also consistent with long-standing South Carolina law that prohibits an insurance

company from reducing its defense obligation by seeking contribution from other similarly triggered insurance companies that may also have a duty to defend the policyholder against potentially covered lawsuits. *Sloan Constr. Co. v. Cent. Nat'l Ins. Co. of Omaha*, 269 S.C. 183 (1977); *Transcontinental Ins. Co. v. MAJ Enters., Inc.*, No. 2:05-cv-02594, 2005 WL 3465573 (D.S.C. Dec. 19, 2005); *Assurance Co. of Am. v. Penn-Am. Ins. Co.*, No. 4:11-cv-03425-RBH, 2013 WL 1282141 (D.S.C. Mar. 27, 2013); *Liberty Mut. Fire Ins. Co. v. J.T. Walker Indus.*, No. 2:08-2043-MBS, 2012 WL 3292973 (D.S.C. Aug. 10, 2012), *rev'd in part on other grounds*, --- F. A'ppx ---, 2014 WL 504086, at *1 (4th Cir. Feb. 10, 2014). The consistent rulings from the South Carolina appellate courts required Harleysville to pay all attorneys' fees and related costs to defend Beazer against all claims in the *True Blue Lawsuit*, and Harleysville should not be permitted to reduce its obligation by set-off.

Moreover, equity favors enforcing the South Carolina collateral source rule in this case. If the judgment entered by the District Court were modified to deny Harleysville set-off relief, Beazer would still have unreimbursed losses from the *True Blue Lawsuit*.[18] Harleysville should not be permitted to breach its duty to

---

[18] Beazer's costs: (1) Defense cost payments: $2,572,522.05 [JA7559 n. 5] + (2) Settlement payments by Beazer to HOA: $3,336,800 [JA6187; JA6195; JA6279] = ***$5,909,322.05*** [Total Beazer Cost For *True Blue Lawsuit*].
Beazer Recoveries / Potential Recoveries: (1) Confidential Settlement 1: $280,000 (this settlement agreement involved two separate insurance carriers

defend Beazer in the *True Blue Lawsuit* for a period of over four years — until the District Court granted Beazer's motion for partial summary judgment — and then benefit from that wrongful act as a result of Beazer's efforts to recover from other insurance companies.

The District Court also erred in calculating the amount of damages for Harleysville's breach of its duty to indemnify Beazer, which is separate and distinct from Harleysville's breach of its duty to defend.  Harleysville's duty to indemnify covers the cost to repair that portion of the progressive water damage at the True Blue Project that took place during the period the Harleysville Policy was in effect.  *Crossmann II*, 395 S.C. 40.  *Crossmann II* provides a "basic formula" from which to calculate Harleysville's indemnity obligation.  The formula requires the fact finder to determine what portion of the covered property damage took place during the period the Harleysville Policy was in effect.  *Id*. at 65.

The District Court below found that the property damage at the True Blue Project ended the day that Beazer mailed a settlement check to the HOA plaintiffs

---

and is treated by the District Court in its findings as two separate settlements) [JA7668] + (2) Confidential Settlement 2: $460,000 [JA7676] + (3) Confidential Settlement 3: $79,390.51 in defense and an additional $500,000 [JA7679-80] + (4) Cincinnati Settlement: $626,000 [JA6713]; + (5) Certain London-Based Insurers Settlement: $1,100,000 [JA6144] + (6) relief requested by Beazer in this appeal $2,448,541.21 = ***$5,493,931.72***, which is less than Beazer's total cost for *True Blue Lawsuit*.

If Beazer prevails on all issues in this appeal, Beazer's unreimbursed loss for the *True Blue Lawsuit* would be $415,390.33.

to resolve the *True Blue Lawsuit*.   Beazer maintains that the "end date" for calculating the amount of property damage for which Harleysville must pay should be the date the *True Blue Lawsuit* was filed.   Otherwise, insurers will be improperly incentivized to breach their duty to indemnify their policyholder for as long as possible, including the period of time necessary for insurance coverage lawsuits to run their course, so as to reduce their overall indemnity obligation.

In the alternative, Beazer submits that the "end date" for calculation of the allocation period for Harleysville's indemnity obligations should be November 21, 2012, the date that Beazer executed a final settlement agreement with the True Blue HOA, which fixed the amount Beazer would pay to repair the damage at the True Blue Project.

## ARGUMENT

### I.    Standard Of Review

Beazer appeals two aspects of the District Court's rulings.   First, Beazer appeals the District Court's application of the South Carolina collateral source rule. On this point, the Court's review is *de novo*.   "Appellate review of a district court's interpretation or application of state law is *de novo*."   *Bryte ex rel. Bryte v. Am. Household, Inc.*, 429 F.3d 469, 475 (4th Cir. 2005) (citing *James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004).

Second, Beazer appeals the District Court's finding that the *pro rata* time-on-risk allocation period for the *True Blue Lawsuit* ended when Beazer signed and mailed a settlement check to the True Blue HOA, on January 17, 2013. On this point, the Court's review is for clear error. *F.T.C. v. Ross*, 743 F.3d 886, 894 (4th Cir. Feb. 25, 2014) ("In a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo.") (citing Fed. R. Civ. P. 52; *Helton v. AT&T, Inc.*, 709 F.3d 343, 351 (4th Cir. 2013)); *Schrock v. Lancer Ins. Co.*, 466 F. A'ppx 169 (4th Cir. 2012) (per curiam) (same).

## II.     The South Carolina Collateral Source Rule Applies To Breach Of Contract Claims, Including Claims For Breach Of Insurance Contracts

In reaching its conclusion to grant Harleysville a set-off, the District Court stated that "[t]he collateral source rule [in South Carolina] only applies to tort claims." [JA7584.] The District Court's Judgment does not cite any South Carolina judicial opinion standing for this broad proposition, and Beazer has not found a reported case applying South Carolina substantive law that supports the District Court's set-off ruling.

To the contrary, the South Carolina Supreme Court has applied the collateral source rule to deny non-settling defendants any set-off relief in breach of contract claims. In *Atkinson*, the plaintiffs purchased a home that was covered under separate termite contracts with Orkin and Terminix pursuant to which Orkin and

37

Terminix agreed to indemnify the Atkinsons against termite damage to their home. 361 S.C. at 160-61. When the Atkinsons discovered termite damage and Terminix and Orkin refused to perform under their contracts, the Atkinsons filed a lawsuit against both companies. The Atkinsons settled with Terminix before trial, and proceeded to trial against Orkin for negligence and breach of contract, as well as on fraud claims related to the termite contract. After a jury verdict in the Atkinsons' favor, Orkin argued that the proceeds from the Terminix pretrial settlement should be applied as a set-off to reduce the damages awarded to the Atkinsons at trial. The trial court agreed, and reduced the final judgment against Orkin by the amount of the Atkinsons' settlement with Terminix. The South Carolina Supreme Court reversed, rejecting Orkin's argument, and holding that the Terminix settlement was from a "collateral source," and that no set-off was proper. *Id.* at 171-72. The court in *Atkinson* reasoned that "[t]he duties that Orkin and Terminix owed the Atkinsons were based upon ***independent, unrelated contracts***, not a common duty of care," and that the trial court erred by offsetting the Orkin judgment by the amount of the Terminix settlement. *Id.* at 172 (emphasis added). As a result, Orkin was ordered to pay the full amount of the judgment: $6,191 for breach of contract, $69,068.33 for negligence, and $786,500 in punitive damages related to fraud. *Id.* at 163.

38

The facts in *Atkinson* are similar in several respects to the facts in the case at bar. The Atkinsons were parties to two contracts with two different pest-control companies, and both contracts provided indemnity in the event of termite damage to the covered property. The South Carolina Supreme Court permitted the Atkinsons to recover under both contracts — in essence a double recovery — stating that it would be inequitable for Orkin to receive a windfall merely as a result of the separate contract the Atkinsons had with Terminix. Similarly, Beazer entered into contracts with multiple insurers by purchasing insurance directly from, among others, Harleysville, Cincinnati, and certain London-based insurers ("London"). Beazer was also entitled to coverage under insurance policies of subcontractors that performed work at the True Blue Project, which policies named Pinehurst, Crossmann, and/or Beazer as additional insureds. The South Carolina Supreme Court did not permit a set-off in *Atkinson*, and no set-off should be permitted under the facts of this case.

*Atkinson* cannot stand for the proposition that South Carolina courts have refused to apply the collateral source rule in breach of contract cases. In *Atkinson* the trial court awarded $6,191 for breach of contract, $69,068.33 for negligence, and $786,500 in punitive damages related to the breach of contract. *Id.* at 163. The court awarded the Atkinsons $6,191 **solely** for breach of contract damages, and did not reduce this amount by any portion of the pre-trial Terminix settlement.

If South Carolina courts did not apply the collateral source rule to breach of contract claims, then the $6,191 breach of contract award should have been reduced by set-off to account for the Atkinsons' recovery from Terminix. The South Carolina Supreme Court reached this ruling because the collateral source rule applies to breach of contract claims as well as to tort claims.

Following *Atkinson*, the South Carolina Court of Appeals has held that the collateral source rule applied to preclude any set-off relief for a workers' compensation insurer for amounts paid by another insurer to the plaintiff-employee for the same injury. *Wilkinson v. Palmetto State Transp. Co.*, 371 S.C. 365 (2006), *rev'd on other grounds* 382 S.C. 295 (2009). In that case, Mr. Wilkinson was killed in a truck accident, and his wife and children sought survivor benefits from Mr. Wilkinson's employer and its workers' compensation insurer. After the South Carolina Workers' Compensation Commission ordered the workers' compensation insurer to pay survivor benefits to the Wilkinsons, the workers' compensation insurer contended that it was entitled to a set-off, and that the award against it should be reduced by the amount of the payment the Wilkinsons received from Zurich Insurance Company under an occupational disability policy purchased by the Wilkinsons years earlier. The Workers' Compensation Commission and the trial court ruled that the payments to the Wilkinsons by Zurich were from a collateral source, because the insurance contracts (*i.e.*, the employer's workers'

compensation policy and the Zurich occupational disease policy) were separate and unrelated, and therefore no set-off was permitted under South Carolina law.

The workers compensation insurer appealed to the South Carolina Court of Appeals.  The Court of Appeals affirmed the rulings of the Workers' Compensation Commission and the trial court that the South Carolina collateral source rule precluded one insurer ordered to pay benefits under an insurance policy from claiming a set-off for payments received by the policyholder from another, unrelated insurance policy.  Citing *Atkinson*, the Court of Appeals noted that "compensation from an independent source will not reduce the payment for which another party is liable for the injured party."  Because it was "undisputed that Scott [Wilkinson] paid all of the premiums for the Zurich [occupational disease] policy, and Palmetto [Scott Wilkinson's employer] did not contribute in any way to the premiums," the Court held that "it flies in the face of equity to grant [the employer's workers compensation insurer] a windfall benefit by allowing it to take credit against any sums Lea Ann [Wilkinson] received from other sources." *Wilkinson*, 371 S.C. at 376-77.[19]

---

[19] The South Carolina Supreme Court subsequently reversed the ruling in favor of the Wilkinsons on the grounds that Mr. Wilkinson was not an employee of Palmetto, but rather an independent contractor, and therefore was entitled to no workers' compensation benefits of any kind.  Because the Supreme Court found for the employer and its insurer on this threshold issue, the Supreme Court did not address the set-off issue dealt with by the Workers' Compensation Commission, the trial court and the Court of Appeals. *Wilkinson*, 382 S.C. at

*Wilkinson* did not involve any underlying tort claims. Rather, the issue was limited solely to breach of contract claims, and whether one insurer ordered to pay benefits under an insurance policy was entitled to a set-off for payments received by the injured party from an unrelated insurance policy. The Court of Appeals ruled that the collateral source rule barred any such set-off.

South Carolina courts have long applied the collateral source rule in the context of breach of contract claims. Yet another example is *Otis Elevator, Inc. v. Hardin Construction Company*, 316 S.C. 292 (1994). In *Otis*, the South Carolina Supreme Court applied the collateral source rule to preclude any set-off relief of an award for breach of a contractual indemnity provision. In that case, Otis Elevator was a subcontractor for Hardin Construction ("Hardin"), hired to install elevators at Hardin's project in the Palmetto Center in Columbia, South Carolina. Hardin and Otis agreed that Hardin could have use of an uncompleted elevator that Otis was constructing, subject to a contract whereby Hardin agreed to indemnify Otis for any claims, liability, or expenses arising from any accident in the uncompleted elevator. *Id*. at 294-95. When a carpeting subcontractor fell down the shaft of the uncompleted elevator, the carpeting subcontractor sued Otis, alleging negligence, strict liability, and breach of warranties. *Id*. at 295. Otis settled the underlying lawsuit, recovered from its insurance carrier, Liberty Mutual, and then filed suit

---

307. This disposition of *Wilkinson* by the Supreme Court does not invalidate the reasoning of the Court of Appeals on the collateral source rule issues.

against Hardin for indemnification. *Id*. The trial court awarded $892,000 to Otis, but reduced the judgment to $250,000 by granting Hardin a set-off for the amount Otis had recovered from Liberty Mutual. *Id*. at 300. The Supreme Court held that the offset was in error. "Hardin Construction should not receive the benefit of an insurance contract for which Otis Elevator paid the premiums." *Id*. The court summarized that "'if one party is entitled to indemnity from another, the right to indemnity is not defeated by the fact that the loss to be indemnified[20] for was actually paid by an insurance company.'" *Id*. (internal citations omitted).

*Atkinson*, *Wilkinson*, and *Otis* bar Harleysville from receiving any set-off in this case. As shown below, precluding set-off in this case is also consistent with South Carolina precedent that prohibits insurers from seeking contribution for breach of the duty to defend, with South Carolina public policy, and with the equitable considerations in this case.

---

[20] Under South Carolina law, an offset would be even more inappropriate with respect to an insurance company's defense obligation, because the duty to defend is much broader than the duty to indemnify. *See, e.g.*, *Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, 809 F. Supp. 2d 449, 457 (D.S.C. 2011) ("In South Carolina, an insurer's duty to defend is broader than its duty to indemnify.") (citing *Liberty Life Ins. Co. v. Commercial Union Ins. Co.*, 857 F.2d 945 (4th Cir. 1988).

A.    **Application Of The Collateral Source Rule Is Consistent With South Carolina Law Prohibiting Insurers From Seeking Contribution For Breach Of The Duty To Defend**

After breaching its duty to defend for four years — from its initial decision in August 2009 to pay only a fraction of Beazer's defense costs to the date judgment was entered in September 2013 — Harleysville seeks to reduce the damages owed Beazer for breach of its duty to defend by offsetting the judgment against Harleysville with proceeds from settlements Beazer reached with insurers other than Harleysville. Beazer alone, at its own effort and expense, pursued these settlements with other insurers, and the payments were not received by Beazer until late 2012 and early 2013 — over three years after Harleysville first breached its duty to defend. This attempt by Harleysville to narrow the scope of its duty to defend by claiming entitlement to the benefits of other insurance policies is contrary to well-settled South Carolina law.

The controlling authority on this point in South Carolina is *Sloan Construction Company Inc. v. Central National Insurance Co. of Omaha*, 269 S.C. 183 (1977). In *Sloan*, two insurers provided liability coverage to their policyholder for claims arising from an accident. The South Carolina Supreme Court addressed the issue of whether one insurer selected to defend the underlying case could recover in contribution against the non-paying insurer for the cost to defend the underlying lawsuit. The Supreme Court held the insurer that defended the case,

44

Liberty, had no right of contribution against the other insurer, Central, that did not defend the policyholder. Liberty was obligated to defend the entire lawsuit by the terms of its insurance contract, and "[w]hen Liberty undertook the defense of the [underlying] action, it was doing no more than it was obligated to do under the terms of its contract with Sloan." *Id.* at 186. The Supreme Court found "[t]he fact that Central also had a duty to defend" to be "irrelevant to the rights and duties existing between Liberty and Sloan by reason of their insurance contract." *Id.*

When a policyholder purchases two insurance policies, and pays each insurer to provide a full defense in the event the policyholder is sued for a potentially covered claim, in South Carolina the policyholder may select a single insurer to defend the entire lawsuit related to the covered claim because the "duty to defend is personal to each insurer." *Id.* Stated another way, "[t]he obligation is several and the insurer is not entitled to divide the duty nor require contribution from another absent a specific contractual right." *Id.* Each insurer is "contractually bound to conduct a defense" of the insured against all claims in the underlying lawsuit because that is precisely what the insured contracted and paid for. *Id.* at 189.[21]

---

[21] The South Carolina law on this issue of a triggered liability insurer's duty to pay all the policyholders' defense costs without the right to reduce that obligation by payments that may be owed by another insurer is very clear. In that regard, in *Assurance Co. of Am.*, 2013 WL 1282141, *4, a separate coverage action presided over by the Honorable R. Bryan Harwell, the court

The result in *Sloan* is clear and applies to the facts of this case.  Other South Carolina courts have reaffirmed the holdings in *Sloan*.   For example, in *Transcontinental Insurance Company v. MAJ Enterprises*, the court affirmed that the "reasoning behind Sloan" enabled a policyholder to select one insurer to defend an entire case as "each insurer's contractual duty remains personal, separate and indivisible."  2005 WL 3465573, at *3.  *See also Assurance Co. of Am. v. Penn-Am. Ins. Co.*, No. 4:11-CV-03425-RBH, 2013 WL 1282141 (D.S.C. Mar. 27, 2013); *Liberty Mut. Fire Ins. Co. v. J.T. Walker Indus.*, No. 2:08-2043-MBS, 2012 WL 3292973 (D.S.C. Aug. 10, 2012), *rev'd in part on other grounds*, --- F. A'ppx ---, 2014 WL 504086, at *1 (4th Cir. Feb. 10, 2014) ("[A]firm[ing] the district court's ruling on all issues except bad faith damages.").  Under these cases, Beazer had a right to look to Harleysville to defend Beazer against all claims in the *True Blue Lawsuit*, and Harleysville has no right to reduce its defense obligation with payments from other insurers.

---

was asked to certify a question to the South Carolina Supreme Court on whether the holding in *Sloan* — that a liability insurer was obligated to pay 100 percent of the policyholders' defense costs without any right to contribution — was still good law in South Carolina.  The District Court held that it was, and denied the insurer's motion for a certified question.  *Id*.  ("The Court cannot say that there is no controlling precedent in South Carolina, given the Court's construction of the ruling in *Sloan*.  Therefore, certification is not necessary.").

### B. The District Court's Grant Of Set-Off Relief To Harleysville Frustrates South Carolina Public Policies Regarding Insurance Coverage

The Court's award of set-off relief to Harleysville undermines several public policies served by South Carolina's "liberal" application of the collateral source rule. For example, an insurer's duty to defend its policyholder is extremely broad under South Carolina law,[22] and insurers are encouraged to defend their policyholders (often under reservations of rights) in situations when the insurer's indemnity obligation for the underlying lawsuit is in doubt. In this case, Harleysville left Beazer to fend for itself, and no other insurer offered to defend Beazer in the *True Blue Lawsuit*. Beazer expended considerable sums of its own money from 2009-2013 to enforce Harleysville's duty to defend and to pursue coverage claims against insurers other than Harleysville. If Beazer had not undertaken this effort, or if Beazer's efforts had been unsuccessful, Harleysville would owe Beazer 100 percent of the attorneys' fees and costs to defend the *True Blue Lawsuit* with no set-off. If the District Court's set-off ruling is not reversed, then insurers like Harleysville have little incentive to honor their duty to defend

---

[22] *See Ross Dev. Corp.*, 809 F. Supp. 2d at 457 ("In South Carolina, an insurer's duty to defend is broader than its duty to indemnify.") (citing *Liberty Life Ins. Co.*, 857 F.2d 945); *Berenyi, Inc. v. Landmark Am. Ins. Co.*, No. 2:09-cv-01556, 2010 WL 233861, at *4 (D.S.C. Jan. 14, 2010) ("In short, if there is even one aspect of the claim which must be defended, the insurer must defend the entire suit.") (citing *Isle of Palms Pest Control*, 319, S.C. 12, 14 (Ct. App. 1994).

policyholders.  Why should Harleysville be the beneficiary of Beazer's difficult and expensive pursuit of this coverage action and pursuit of other insurers?

In addition, South Carolina law clearly requires the insurer selected by the policyholder to defend the case to pay all reasonable and necessary defense costs, and that insurer has no right of contribution against any other insurer that may also have a duty to defend.  *Sloan*, 269 S.C. 183.  This rule promotes the common practice in South Carolina whereby multiple insurers with duties to defend the policyholder enter into defense cost sharing agreements in the early stages of potentially covered litigation against their mutual policyholder.  The District Court's grant of set-off to Harleysville rewards Harleysville's intransigence and is a disincentive for co-insurers to pursue and enter into defense cost-sharing agreements.

### C.     Considerations Of Equity Preclude Harleysville From Reducing Its Liability by Set-Off

South Carolina law provides that set-off is an equitable remedy.  *Welch v. Epstein*, 342 S.C. 279, 313 (2000).  Numerous equitable factors weigh against awarding Harleysville a set-off.  First, the District Court ruled that Harleysville breached its duty to defend Beazer, starting in 2009.  Harleysville's breach of its duty to defend has continued into 2014.  Harleysville should not be rewarded for breaching its insurance contract.

48

Second, there were numerous *ex parte* communications between, on the one hand, Mr. Stephen Brown (an attorney who defends insurance companies against bad faith litigation [JA6290]) and his colleagues at the law firm Young Clement Rivers LLP ("YCR"), who were ostensibly retained by Harleysville to provide a limited defense to Beazer for claims related to Buildings 1-13 only, and on the other hand, Harleysville employees and lawyers, including Harleysville's counsel of record in this insurance coverage action. These documents show that Harleysville sought to obtain an unfair advantage in this coverage action by partnering with YCR, which was supposed to be Beazer's counsel. [*See, e.g.,* JA4723 (YCR's time records describing work to "[r]eceive and review correspondence from M[artha] Brown [Harleysville coverage counsel] regarding request for information."); JA4841 ("At the request of coverage counsel Martha Brown to file share the complete Prolaw file. . ."); JA4842 ("Telephone conference with attorney Brown regarding efforts to defend Beazer"); JA4899 ("Telephone conference with attorney Calamari [Harleysville coverage counsel] regarding status of case").]

Several *ex parte* communications between YCR and Harleysville were particularly egregious. For example, on November 26, 2012, YCR's senior partner, Mr. Stephen Brown, made a time entry in his billing records for "correspondence to Brian Tormey [a Harleysville employee assigned to the True

49

Blue coverage matter] *addressing possible avenues for Beazer to pursue against us*." [JA4899 (emphasis added).]   A further notable series of *ex parte* communications occurred in June 2012, when Harleysville was preparing its motion for summary judgment to file in this case asking the District Court below to dismiss Beazer's Third-Party Complaint.   [JA5809.]   Harleysville's coverage lawyers in this case asked Mr. Brown of YCR to execute an affidavit, which Harleysville used as evidentiary support for its claim that Harleysville had complied with its duty to defend Beazer.  [*Id*.]   There is no evidence that any Beazer representative knew anything about these communications leading up to and including finalizing Mr. Brown's affidavit until after Harleysville's motion for summary judgment and supporting papers were filed with the District Court. These equitable considerations also warrant reversal of the District Court set-off ruling in favor of Harleysville.

### III.   Under South Carolina Law, When Calculating Harleysville's Time-On-Risk *Pro Rata* Share Of Progressive Damage In The *True Blue Lawsuit*, The District Court Erred In Selecting The Date Beazer Mailed Settlement Checks To Resolve The *True Blue Lawsuit* As The Ending Date Of The Progressive Damage

In progressive property damage cases arising from defective construction, South Carolina courts calculate an insurer's indemnity obligation, which is separate and distinct from its defense obligation, according to the *pro rata* time-on-risk method outlined in *Crossmann II*.  That case instructs courts to approximate

how much damage took place during a particular policy period by applying the *Crossmann II* "basic formula." "The basic formula consists of a numerator representing the number of years an insurer provided coverage and a denominator representing the total number of years during which the damage progressed. This fraction is multiplied by the total amount the policyholder has become liable to pay as damages for the entire progressive injury." *Crossmann II*, 395 S.C. at 65. Applying the basic formula, it is necessary to count the days the damage progressed at each building beginning with the date of the first damage, and ending on the end date of the allocation period. The District Court ruled that the allocation period for the progressive damage at the True Blue Project ended when Beazer mailed the first of its two settlement checks to the HOA to resolve the *True Blue Lawsuit*. [JA7560, ¶2.]

The District Court's findings on this issue were improperly based on the result in *Crossmann II*, where Beazer and the insurers in that case had stipulated prior to trial that "the damage 'progressed until repaired or until Beazer Homes paid to settle the underlying cases, whichever came first[,]'" and not because of a ruling by the *Crossmann II* court. 395 S.C. at 65 (quoting a pretrial stipulation among the parties). There is no such stipulation between Harleysville and Beazer in the present action dealing with the *pro rata* time-on-risk allocation period for the True Blue Project.

The District Court's decision rewards insurance companies for wrongfully denying their duty to indemnify. Stated another way, an insurance company can substantially reduce its indemnity obligation under the District Court's ruling simply by saying "no" to the policyholder at every juncture, forcing the policyholder to litigate with the underlying plaintiffs, instead of the insurers participating in good faith with the policyholder in a settlement of the underlying action. The District Court's ruling on this issue would thus cause several negative effects: (1) increase litigation in underlying cases between the policyholder and the underlying plaintiffs; (2) increase litigation in insurance coverage cases between policyholders and insurance companies; and (3) prolong the time before the damage at issue in underlying lawsuits is remedied. None of these results would be expected by the average business person entering into a contract of insurance.

Under *Crossmann II* the proper end date for calculating the progressive damage in this matter should be the date the underlying lawsuit was filed, after which point Beazer may not have been able to purchase additional insurance for the *True Blue Lawsuit* because of the "known loss" doctrine. Moreover, if Harleysville had honored its duties at the time the *True Blue Lawsuit* was filed, it is

possible that Beazer could have negotiated a settlement to repair the damage earlier.[23]

Revised "time on risk" calculations that use the date that the *True Blue Lawsuit* was filed as the end date for the allocation period follow and show a total indemnity obligation of $4,668.85.

| Building | CO Date Plus 30 Days | End Date | Total Days of Risk | Days on Risk | Covered Damages Per Bldg. | Harleysville Pro Rata Share |
|---|---|---|---|---|---|---|
| 7 | 8/30/1997 | 6/17/2009 | 4309 | 364 | $7,584 | $640.65 |
| 6 | 9/6/1997 | 6/17/2009 | 4302 | 357 | $7,584 | $629.36 |
| 2 | 9/13/1997 | 6/17/2009 | 4295 | 350 | $7,584 | $618.02 |
| 4 | 10/4/1997 | 6/17/2009 | 4274 | 329 | $7,584 | $583.79 |
| 5 | 10/25/1997 | 6/17/2009 | 4253 | 308 | $7,584 | $549.23 |
| 3 | 11/6/1997 | 6/17/2009 | 4241 | 296 | $7,584 | $529.32 |
| 1 | 12/25/1997 | 6/17/2009 | 4192 | 247 | $7,584 | $446.86 |
| 10 | 6/4/1998 | 6/17/2009 | 4031 | 86 | $7,584 | $161.80 |

---

[23] The Court in *Crossmann II* adopted a *pro rata* indemnity allocation to incentivize policyholders to purchase sufficient insurance coverage by holding them responsible for property damage occurring during periods when they are, ***by their own choice***, without sufficient coverage. *Crossmann II*, 395 S.C. at 63. Although the Fourth Circuit has assumed that South Carolina would adopt a narrow version of the common law "known loss doctrine" (*see Stonehenge Eng'g Corp. v. Emp'rs Ins. of Wausau*, 201 F.3d 296 (4th Cir. 2000)), under circumstances different than those in *Stonehenge*, it is possible that the known loss doctrine would bar Beazer from obtaining insurance for claims arising from the True Blue Project after the filing of the *True Blue Lawsuit*, when it knew it may be liable for some damage at the True Blue Project. If Beazer were penalized for not being able to purchase insurance that would provide coverage for the *True Blue Lawsuit* after the lawsuit was filed, then the District Court's holding would violate *Crossmann II*.

| Building | CO Date Plus 30 Days | End Date | Total Days of Risk | Days on Risk | Covered Damages Per Bldg. | Harleysville Pro Rata Share |
|---|---|---|---|---|---|---|
| 9 | 6/4/1998 | 6/17/2009 | 4031 | 86 | $7,584 | $161.80 |
| 11 | 6/11/1998 | 6/17/2009 | 4024 | 79 | $7,584 | $148.89 |
| 8 | 6/28/1998 | 6/17/2009 | 4007 | 62 | $7,584 | $117.35 |
| 12 | 7/17/1998 | 6/17/2009 | 3988 | 43 | $7,584 | $81.77 |
| 13 | 9/2/1998 | 6/17/2009 | 3941 | 0 | $7,584 | $0.00 |

*$4,668.85*

In the alternative, the end date for progressive damage at the True Blue Project selected by the District Court is clear error because the allocation period continued for several months after Beazer agreed to settle the *True Blue Lawsuit*. Beazer executed a final settlement agreement with the True Blue HOA on November 21, 2012, which agreement fixed the amount Beazer would pay to repair the damage at the True Blue Project on that date. [JA6187.] Under the terms of the settlement, it was impossible for Beazer's exposure to increase or decrease based on additional property damage at the True Blue Project that occurred after the settlement was finalized. The District Court, however, found as a matter of fact, that damage continued until Beazer mailed a settlement check to the True Blue HOA on January 17, 2013. [JA6195.] Beazer could not possibly be responsible for damage at the True Blue Project after finalizing a settlement

agreement that fixed the damages, and the District Court's finding was in clear error.

Using November 21, 2012 as the end date for the "time on risk" calculations, Harleysville's obligation is $3,602.51.

| Building | CO Date Plus 30 Days | End Date | Total Days of Risk | Days on Risk | Covered Damages Per Bldg. | Harleysville Pro Rata Share |
|---|---|---|---|---|---|---|
| 7 | 8/30/1997 | 11/21/2012 | 5562 | 364 | $7,584 | $496.33 |
| 6 | 9/6/1997 | 11/21/2012 | 5555 | 357 | $7,584 | $487.40 |
| 2 | 9/13/1997 | 11/21/2012 | 5548 | 350 | $7,584 | $478.44 |
| 4 | 10/4/1997 | 11/21/2012 | 5527 | 329 | $7,584 | $451.44 |
| 5 | 10/25/1997 | 11/21/2012 | 5506 | 308 | $7,584 | $424.24 |
| 3 | 11/6/1997 | 11/21/2012 | 5494 | 296 | $7,584 | $408.60 |
| 1 | 12/25/1997 | 11/21/2012 | 5445 | 247 | $7,584 | $344.03 |
| 10 | 6/4/1998 | 11/21/2012 | 5284 | 86 | $7,584 | $123.43 |
| 9 | 6/4/1998 | 11/21/2012 | 5284 | 86 | $7,584 | $123.43 |
| 11 | 6/11/1998 | 11/21/2012 | 5277 | 79 | $7,584 | $113.54 |
| 8 | 6/28/1998 | 11/21/2012 | 5260 | 62 | $7,584 | $89.39 |
| 12 | 7/17/1998 | 11/21/2012 | 5241 | 43 | $7,584 | $62.22 |
| 13 | 9/2/1998 | 11/21/2012 | 5194 | 0 | $7,584 | $0.00 |

*$3,602.51*

## CONCLUSION

For the foregoing reasons, Beazer respectfully requests that this Court enforce the South Carolina collateral source rule by reversing the District Court's set-off ruling and holding that the defense cost portion of the judgment against

Harleysville is $2,443,872.36.  Beazer also respectfully requests that this Court set the end date for progressive water damage at the True Blue Project as the date the *True Blue Lawsuit* was filed, and holding that the judgment against Harleysville for breach of its duty to indemnify is $4,668.85.  Reversing the two District Court rulings as requested by Beazer should result in the judgment against Harleysville being increased to $2,448,541.21.

Also, Beazer requests that once this appeal is concluded, if this Court affirms the District Court's award of attorneys' fees and costs incurred by Beazer for this coverage action, the Court remand the case to the District Court to rule on Beazer's Rule 54 motion [JA7640] and otherwise calculate the appropriate amount of attorneys' fees and costs to be awarded to Beazer.

### REQUEST FOR ORAL ARGUMENT

Beazer respectfully requests oral argument in this matter.

Respectfully Submitted,

  /s/ Martin M. McNerney
Martin M. McNerney
Taylor T. Lankford
KING & SPALDING LLP
1700 Pennsylvania Ave., NW, Ste. 200
Washington, DC 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
mmcnerney@kslaw.com
tlankford@kslaw.com

*Attorneys for Appellants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, I hereby certify:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because it contains 13,185 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Time New Roman font.

May 1, 2014

*/s/ Martin M. McNerney*
Martin M. McNerney

*Attorney for Appellants*

## CERTIFICATE OF SERVICE

I certify that on May 1, 2014 the foregoing document was served on all parties or their counsel of record through the Courts CM/ECF.

May 1, 2014

*/s/ Martin M. McNerney*
Martin M. McNerney

*Attorney for Appellants*

# ADDENDUM

**8 Del. Code § 259**

**Chapter 1. General Corporation Law**

**Subchapter IX. Merger, Consolidation or Conversion**

**Status, rights, liabilities, of constituent and surviving or
resulting corporations following merger or consolidation.**

(a)     When any merger or consolidation shall have become effective under this chapter, for all purposes of the laws of this State the separate existence of all the constituent corporations, or of all such constituent corporations except the one into which the other or others of such constituent corporations have been merged, as the case may be, shall cease and the constituent corporations shall become a new corporation, or be merged into 1 of such corporations, as the case may be, possessing all the rights, privileges, powers and franchises as well of a public as of a private nature, and being subject to all the restrictions, disabilities and duties of each of such corporations so merged or consolidated; and all and singular, the rights, privileges, powers and franchises of each of said corporations, and all property, real, personal and mixed, and all debts due to any of said constituent corporations on whatever account, as well for stock subscriptions as all other things in action or belonging to each of such corporations shall be vested in the corporation surviving or resulting from such merger or consolidation; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations, and

the title to any real estate vested by deed or otherwise, under the laws of this State, in any of such constituent corporations, shall not revert or be in any way impaired by reason of this chapter; but all rights of creditors and all liens upon any property of any of said constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

(b)    In the case of a merger of banks or trust companies, without any order or action on the part of any court or otherwise, all appointments, designations, and nominations, and all other rights and interests as trustee, executor, administrator, registrar of stocks and bonds, guardian of estates, assignee, receiver, trustee of estates of persons mentally ill and in every other fiduciary capacity, shall be automatically vested in the corporation resulting from or surviving such merger; provided, however, that any party in interest shall have the right to apply to an appropriate court or tribunal for a determination as to whether the surviving corporation shall continue to serve in the same fiduciary capacity as the merged corporation, or whether a new and different fiduciary should be appointed.

8 Del. C. 1953, § 259; 56 Del. Laws, c. 50; 56 Del. Laws, c. 186, § 23.